UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA

    -v-                                 No.  10 Cr. 84 (LTS)

ANDRE HEYWARD,

        Defendant.

--------------------------------------------------------x

### Memorandum Opinion and Order

      Defendant Andre Heyward ("Defendant" or "Heyward") has moved pursuant to Federal Rule of Criminal Procedure 12(b)(3) to dismiss the three-count Indictment in the above-captioned case.  Count One of the Indictment charges Defendant with engaging in the business of selling firearms in interstate commerce without a license, in violation of 18 U.S.C. § 922(a)(1)(A), and Counts Two and Three charge Defendant with possessing firearms after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).  Defendant contends that the scope and degree of government involvement in the criminal conduct with which he is charged violated his right to Due Process under the Fifth Amendment and mandate dismissal of the Indictment.  On October 28, 2010, the Court held an evidentiary hearing in connection with the issues raised in his motion.  For the following reasons, Defendant's motion is denied.

### Background

      To violate due process, government involvement in an investigation underlying a prosecution must "shock the conscience."  United States v. Chin, 934 F.2d 393, 398 (2d Cir. 1991).  "Police over-involvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction."  Hampton v. United States, 425 U.S. 484, 495 n.7 (1976) (Powell,

J., concurring).  Defendant has the burden of demonstrating, by a preponderance of the evidence,

that the Indictment was the product of such outrageous government conduct.  See United States v.

Cuervelo, No. S 89 Cr. 305 (PKL), 1992 WL 30673, at *2 (S.D.N.Y. Feb. 7, 1992).

<u>The Evidence</u>

The evidence presented in connection with Defendant's motion consists of

Heyward's written declaration, the testimony of law enforcement officers called by the

Government, recordings of conversations between the Defendant and an undercover law

enforcement officer (the "Undercover"), the November 24, 2003, Informant Agreement (the

"Agreement") between the Bureau of Alcohol, Tobacco and Firearms (the "ATF") and the

confidential informant (the "Informant") with whom Defendant engaged in the activity for which

he has been indicted, and a handwritten list of names recovered from Defendant's person at the

time of his arrest.  In his Declaration, Heyward, who did not testify at the hearing, proffers that he

was uninvolved with and uninterested in the illegal conduct with which he is charged until, over the

course of several weeks, he was persuaded by the Informant, through shaming insults, to engage in

firearms trafficking.  (Def.'s Decl. ¶¶ 2-3, 7-9.)  Defendant further proffers that the Informant

created, arranged, fully-subsidized, and retained all profits from the transport and sales of the

firearms identified in the Indictment.  (Id. ¶¶ 10-14.)  Defendant proffers that he lacked the means

and inclination to commit the offense conduct until the Informant initiated and orchestrated the

weapons transactions.  (Id. ¶¶ 2-3, 6-7.)  Defendant also asserts that the Informant provided the

firearms involved in the charged offense and instructed him as to how to deal with the buyer on the

Informant's behalf.  (Id. ¶¶ 10, 12-13.)  The firearms in question were purchased from Defendant

by the Undercover; Defendant learned that the buyer was an undercover officer after the

transactions had been completed.  (Id. ¶¶ 11-13, 17.)  Defendant proffers that he engaged in the

offense conduct in furtherance of his hope and plan to himself become a confidential informant. (Id. ¶¶ 9, 14.)

Although Heyward's declaration does not proffer any allegations concerning direction or supervision of the Informant by law enforcement officials, Heyward argues that his allegations as to his status as a mere middle-man in the offense transactions, his initial reluctance to undertake the illegal conduct, his lack of involvement in the conception of the offense, and his financial and logistical inability to commit the offense without the Informant having provided the necessary firearms and transportation are sufficient to carry his burden of showing government involvement that shocks the conscience.

At the hearing held in connection with Defendant's motion, the Government presented testimony that the Informant had been working as such for the ATF since 2003 pursuant to the written Agreement.  (Evidentiary Hr'g Tr. 24, Oct. 28, 2010.)  The Agreement, the terms of the which were reviewed with the Informant before his interactions with Defendant, expressly precluded, inter alia, "participat[ion] in any unlawful activities except insofar as ATF determines that such participation is necessary to this investigation and ATF expressly authorizes such acts in advance," the "initiat[ion of] any plans to commit criminal acts," or the "induce[ment of] any individual to commit a crime that he or she has no predisposition to commit."  (Gov. Ex. 1.)  The Government also called the Undercover, who testified as to his communications and interactions with Heyward, and two law enforcement officers who supervised the Informant during the Heyward investigation.[1]

Peter Shanhai ("Shanhai"), who was an NYPD detective and a member of the

---

[1]   The Informant invoked his Fifth Amendment right to avoid self-incrimination and did not testify at the hearing.

NYPD/ATF Joint Firearms Task Force, testified that the Informant told him that Heyward was involved with firearms and drugs, and that Defendant had approached him about a firearm transaction.  (Hr'g Tr. 47.)  The Informant coordinated with the task force so that the Undercover would communicate directly with Heyward regarding firearms and, in or about September or October 2009, the Undercover conducted three transactions with Defendant, for which the Government supplied the Undercover's purchase money.  (Id. 69-70.)  Shanhai testified that law enforcement officials never provided firearms to the Informant and that he had no reason to believe that the Informant had provided the firearms to Defendant.  (Id. 31.)  Shanhai testified that the Informant told him that Defendant had obtained the firearms from "a girl" (id. 57) and ATF agent Veronica Morales ("Morales"), who also supervised the Informant, testified that the Informant told her that Defendant purchased firearms from a third party on two occasions (id. 141-43).  Morales further testified that an ATF trace and investigation, conducted after Defendant alleged that the Informant was the source of the firearms, had not revealed links between the original purchasers and either Heyward or the Informant.  (Id. 139.)  Shanhai testified that, under the very limited circumstances in which law enforcement personnel would supply a firearm for use in a controlled transaction, the firearm would be rendered inoperable and its serial number recorded in advance. (Id. 20-21.)

        On cross-examination, the defense elicited that the supervising law enforcement officers had not independently investigated the Informant (id. 37-40) or his claims regarding the Defendant (id. 51-56); that the Informant contacted the joint task force agents when he and Heyward were stopped by highway police on the way to New York for a firearms transaction and that the two were allowed to continue to New York after Shanhai intervened with local law enforcement (id. 59-61); and educed testimony regarding the differences between the firearms

Heyward offered to the Undercover versus those actually delivered to the Undercover, the

Informant's statements about the firearms, and price negotiations between Heyward and the

Undercover with respect to future purchases (id. 95-101, 111-14).  None of the testimony at the

hearing indicated, directly or inferentially, that the law enforcement officials had specifically

directed the Informant's interactions with Defendant.  Nor did the testimony indicate that the

officials had any knowledge of the Informant's alleged recruitment of Defendant for the weapons

sales or reason to believe that the Informant was supplying Defendant with the firearms involved in

the offense conduct.

Discussion

The United States Court of Appeals for the Second Circuit has acknowledged that

outrageous government conduct can so vitiate the integrity of a government investigation as to

render any prosecution based on the investigation violative of due process.  See, e.g., U.S. v.

Cuervelo, 949 F.2d 559, 565 (2d Cir. 1991).  However, the Second Circuit has yet to identify a

particular set of circumstances in which government investigative conduct was so egregious that it

shocked the conscience and violated fundamental guarantees of due process.  Its decisions rejecting

due process challenges to criminal charges based on outrageous government involvement in

procuring the commission of a crime indicate that a successful due process challenge must be

predicated, at a minimum, on the government manufacture and direction of the criminal conduct

from beginning to end, with a high level of control of the activity at every stage.  Even with such

government conduct, the defendant's own conduct and resources may preclude a finding of a due

process violation.  The Second Circuit has, thus, rejected due process challenges where a defendant

was, for instance, able to proceed with a criminal plan or enterprise independently of the

government's involvement,[2] a defendant participated in illegal conduct prior to the government's involvement,[3] or a defendant initiated the criminal conduct at issue.[4]  Moreover, the Second Circuit has held that government initiation of and inducement of a defendant to commit a crime, even if the circumstances involve both supplying contraband to and purchasing contraband from a defendant, does not establish government over-involvement in a criminal offense such that due process is violated.  See Duggan, 743 F.2d at 84-85 (reaffirming the holdings of prior decisions that "have upheld against due process challenges drug convictions resulting from transactions initiated by government informants using government-supplied drugs"); United States v. Nunez-Rios, 622 F.2d

---

[2]        See, e.g., United States v. Romano, 706 F.2d 370, 373 (2d Cir. 1983) (government's initiation of a drug transaction and supplying drugs involved in the transaction did not establish outrageous conduct because defendants were "clearly capable of conspiring to purchase and distribute heroin without the active aid and supervision of the government"); United States v. Rahman, 189 F.3d 88, 131 (2d Cir. 1999) (government contribution of direction, technical expertise, and crucial resources to a bomb-making plot did not violate due process because "defendants were already actively advancing a conspiracy, and they already had substantial resources and technical expertise" such that evidence was lacking to demonstrate that the criminal conspiracy would have foundered without government involvement in the form of an informant's participation in the plot).

[3]        See, e.g., United States v. Corcione, 592 F.2d 111, 115 (2d Cir. 1979) (government's buying, concealing, smuggling, and transporting heroin did not violate due process in light of defendants having originally devised and initiated the offense); United States v. Schmidt, 105 F.3d 82, 91-92 (2d Cir. 1997) (elaborate government sting operation, which included impersonating a hit man and arranging a controlled prison breakout, did not violate due process in light of the criminal plan having originated with defendant).

[4]        See, e.g., United States v. Dyman, 739 F.2d 762, 769 (2d Cir. 1984) (government's "extensive" involvement in charged offenses did not violate due process where the evidence showed that it was defendants' idea to engage in the criminal activity and defendants joined the criminal conspiracy voluntarily); United States v. Duggan, 743 F.2d 59, 85 (2d Cir. 1984) (rejecting due process claim where defendant admitting seeking out a government informant and where defendants' testimony about an informant exploiting defendants' emotional and psychological vulnerabilities to coerce their involvement in criminal activity was found not credible).

1093, 1098 (2d Cir. 1980) (holding that the government's investigative conduct did not violate due process even though "the informant had initiated the illegal transaction, had located a buyer and had supplied the narcotics"); cf. United States v. Chin, 934 F.2d 393, 398 (2d Cir. 1991) ("whether investigative conduct violates a defendant's right to due process cannot depend on the degree to which the governmental action was responsible for inducing the defendant to break the law. Rather, the existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it 'shocks the conscience,' regardless of the extent to which it led the defendant to commit his crime.") (citation omitted).

Defendant cites cases from the Third and Ninth Circuits to support his argument that the government's conduct at issue violated the Fifth Amendment's guarantee of due process.  In United States v. Twigg, the evidence indicated that a DEA cooperator, at the request of the DEA, had contacted one of the defendants to discuss setting up a "speed" laboratory.  588 F.2d 373, 375 (3rd Cir. 1978).  The DEA supplied the cooperator with key equipment and raw materials necessary to commit the offense in question, as well as a rented farmhouse in which to set up the laboratory. Id. at 375-76.  The DEA cooperator was "completely" in charge of the laboratory and received only "minor" assistance in drug production from the defendants.  Id. at 376.  On these facts, the Third Circuit found that "the nature and extent of police involvement in this crime was so overreaching as to bar prosecution of the defendants as a matter of law."  Id. at 377.  Defendant also directs the Court's attention to United States v. Williams, in which the Ninth Circuit rejected a due process challenge to defendants' convictions because it was not shown that "the government engineer[ed] and direct[ed the] criminal enterprise from start to finish."  547 F.3d 1187, 1199 (9th Cir. 2008) (citing United States v. Gurolla, 333 F.3d 944, 950 (9th Cir. 2003)).

Defendant's reliance on Twigg and Williams is misplaced.  In both cases, the Courts

of Appeals emphasized the need to demonstrate the government-directed manufacture of an offense

and critical enabling thereof in order to show that investigatory conduct violated due process

guarantees.  Unlike in Twigg, where the DEA cooperator testified that he contacted one of the

defendants at the behest of the DEA, no evidence proffered in Heyward's declaration or educed at

the hearing indicates that the Informant approached Heyward or concocted the firearms transactions

at issue at the behest of law enforcement officials.  As the Ninth Circuit emphasized in Williams,

the government must actively "engineer" and "direct" the charged offense from beginning to end

for a due process challenge to succeed.  See also United States v. Alexandro, 675 F.2d 34, 41-42

(2d Cir. 1982) (rejecting the argument that government initiation of an offense, without a further

element of coercion into the offense or the government creation of an independent, elaborate

criminal enterprise, violates due process).

   The circumstances proffered by Defendant fail to satisfy the standard for

demonstrably outrageous conduct that would violate due process guarantees and, as a result,

mandate the dismissal of criminal charges.  Defendant's motion proceeds on the implicit

assumption that all conduct of the Informant is directly attributable to the government, and should

therefore be treated as government conduct for purposes of the due process analysis, regardless of

whether law enforcement officials initiated or directed the Informant's actions.  In the defense's

view, the Informant's status as a government agent renders the government responsible for

everything the Informant allegedly did.  However, the record, even if all of the content of

Heyward's declaration is taken as true, neither establishes by a preponderance of the evidence that

the Informant's alleged conduct was actually undertaken at the behest of the government, nor that

government officials authorized the Informant to entice the Defendant and manufacture a crime.

Indeed, the testimony indicated that such conduct was specifically prohibited under the terms of the

Informant's Agreement and nothing in the record indicates that the supervising law enforcement officials knew about or authorized any enticement or weapons procurement by the Informant. Under these circumstances, there is no legal or factual basis for holding the government responsible as a principal for the allegedly outrageous activities of the Informant.  Furthermore, the Second Circuit's rejection of the initiation of illegal transactions and supplying of materials as sufficient to warrant the dismissal of indictments on due process grounds casts doubt on whether the Informant's alleged conduct, even if attributed to the government, could be sufficient to sustain Defendant's burden here.

Defendant also argues that, to the extent the government was unaware of the Informant's alleged procurement of Defendant's criminal conduct, this Court should dismiss the Indictment because the government's allegedly negligent oversight of the Informant enabled him to engage in outrageous conduct with respect to the Defendant.  This position is inconsistent with the centrality of active, intentional investigative misconduct to the few decisions in which indictments have been dismissed on due process grounds and lacks any other foundation in law.  See United States v. Brooke, No. 93 Cr. 595 (LAP), 1995 WL 23546, at *3 (S.D.N.Y. Jan. 23, 1995) (finding evidence insufficient to establish that informant was agent of the Government with respect to allegedly outrageous conduct and rejecting alleged failure of supervision as sufficient to establish requisite outrageous conduct.)

For all of the foregoing reasons, Defendant's motion to dismiss the Indictment is denied.  Nothing in this Memorandum Order, however, precludes the Defendant from asserting an entrapment defense at trial.

CONCLUSION

For the reasons stated above, Defendant's motion to dismiss the Indictment is

denied. The next pre-trial conference in this matter remains scheduled for **Wednesday, December 1, at 12:45 p.m.**

The Court finds, pursuant to 18 U.S.C. § 3161(h)(7)(B)(iv), that the ends of justice served by the granting of an exclusion from speedy trial computations for the period from today's date through December 1, 2010, outweigh the best interests of the public and the Defendant in a speedy trial because of the need for reasonable time for the parties to review the Court's ruling and for counsel to provide advice to Defendant in connection therewith. The Court accordingly excludes such time period prospectively.

This Memorandum Order resolves docket entry no. 16.

SO ORDERED.

Dated: New York, New York
      November 9, 2010

LAURA TAYLOR SWAIN
United States District Judge